No. 603

**First Circuit**

———

NATIONAL SAND & GRAVEL CO., INC.,
v. JANES CONTRACTING CO., INC.

———

(March 5, 1930. Opinion and Decree.)
(April 14, 1930. Rehearing Refused.)

———

S. S. Reid, of Amite, attorney for plaintiff, appellant.

J. Y. Sanders, Jr., of Baton Rouge, attorney for defendant, appellee.

MOUTON, J. Plaintiff entered into a contract with defendant company for the sale of sand and gravel from its pit to a spur on the estate of D. H. Sanders near Duncan avenue in Amite City. This contract was verbal. Plaintiff claims that it was also agreed that it would get for switching charges the sum of $5 per car for each car from the pit to the spur on Sanders' estate. The sand and gravel were paid for, the only bone of contention being as to whether or not plaintiff is entitled to recover for the switching charges.

E. M. Whitman is president of plaintiff company, and L. M. Janes was president of defendant company, at the time plaintiff claims the contract for the payment of the switching charges, at the rate stated, was entered into.

Mr. Janes died after this suit was instituted and did not testify at the trial.

Plaintiff says the first contract made in reference to this transaction was entered into at the office of Mr. Janes in the city of Baton Rouge; that he made the contract with Mr. Janes, and that no one else was present. He thinks the stenographer was in the next room, but that she did not hear the conversation that resulted in the agreement in which it was agreed with Mr. Janes that his company would pay $5 per car for these switching charges.

The sand and gravel were being furnished by plaintiff company to defendant company, which was engaged in building street and sidewalk pavements in Amite,

and were delivered near Duncan avenue for the use of defendant company in carrying out its undertaking with the city.

It was testified to by Strickland and Hedge, then employees of defendant company, that when the final arrangements were made with E. M. Whitman for the price of the sand and gravel in October, 1928, Whitman never made the slightest reference to his claim for the switching charges. The testimony of Gilvin, superintendent of defendant, is that he had sent Hedge and Stickland to Amite for the purpose of getting the price for the sand and gravel so that he might make an intelligent bid on the work. He says that Strickland gave him the information over the 'phone, but made no mention of the switching charges. Gilvin got the bid for the sand and gravel at the usual price, after consultation with Whitman.

It appears that the defendant company had done some paving work for Whitman to whom a bill had been sent on the 19th of July, 1928. The next day Whitman sent his bill to defendant company on which the switching charges were carried.

Gilvin, superintendent of defendant company, says it was his first intimation that such a charge was being claimed by White man, who, he said, was much displeased because of the bill defendant had sent him, and that Whitman said he was going to do some charging too. It was also shown by defendant that though a number of invoices had been sent it for the sand and gravel during a period of several months from February, 1928, to the latter part of July of that year, no claim whatsoever had been made for these switching charges. The failure of plaintiff company to include these charges in the invoices, of mentioning them to Strickland, Hedge, or

Gilvin at the time of their conferences with Whitman, hereinabove referred to, should, defendant contends, be taken as strong presumptions to show that the deceased president of defendant company, L. M. Janes, had never entered into any agreement with Whitman to pay the amount claimed by the latter for the switching charges. The defendant contends that the claim for these charges was made by Whitman after the bill by defendant was sent him about which he had expressed his displeasure, and that he had actually said he would also do some charging. The real cause for making the switching charges, defendant claims, was the result of the trouble which had occurred between Whitman and defendant for the bill sent by the latter for Whitman's paving bill.

In support of this contention, the defendant further refers to a letter written in May, 1928, by Whitman to Mr. Janes, the deceased president of defendant company, in which he complains that Gilvin in doing his paving job had overcharged him, stating also therein that if such charges were to be approved he would raise the price on sand and gravel, and that he would not invoice any more material until he heard from Mr. Janes.

From all of the foregoing facts and circumstances, counsel for defendant argue that the switching charges by Whitman were the mere result of an afterthought, and of the desire on his part to get even with defendant company for its paving charges which he claimed were excessive.

Whitman claims, however, that when he contracted with Janes in his office in Baton Rouge, for these charges, it was agreed they would be paid only after Janes had completed his paving work in Amite. There is no one to contradict that such had been

the stipulation as to the time fixed between them when these charges would be collectible.

The bill for $1,245 for the switching charges was sent defendant on July 20, 1928, at which time the work of defendant company in Amite had been completed or had about reached its period of completion and Whitman says the reason he had not sent it earlier, or during the time the building program was going on, was because of his promise to Mr. James of not asking payment before he had completed his paving job. He also explains that when he stated he would do some charging too, he had no reference to the switching charges, but was referring to some paving that he expected would be done by defendant for some school project. He seems to frankly admit that he would have made heavier charges thereafter because of the treatment he claims he had experienced, and that they would not have been the same as before, which he says, all along his testimony, had been originally reduced to help out Mr. Janes with whom he seemed to have been on very friendly relations.

There is nothing apparently unreasonable in that explanation, although, all along, it would not be sufficient to overcome the effect of the silent attitude of Whitman in reference to the claim in question.

We, however, have a letter written by Whitman to Janes, dated August 31, 1928, and Janes' reply thereto which clarifies the situation, and shows that the claim for the switching charges was not trumped up as an afterthought to sustain an unwarranted demand.

In his letter to Janes, Whitman tells him he had a check for $2,489.50 for the sand and gravel used in the contract for 113 cars. He then says:

"However, you failed to send the National Sand and Gravel Company a check for five hundred and fifty-six ($556.00) dollars for switching the one hundred and thirteen (113) cars on contract No. 1. * * * I will appreciate it if you will mail us a check to cover the switching bill by return mail."

The sum of $5 a car, which Whitman claims was the amount defendant was to pay, would constitute a total for the 113 cars of exactly the sum of $565, the payment of which was demanded in Whitman's letter.

Janes answered it September 8, 1928. In that answer there is not the slightest denial by Janes that he did not owe the amount asked for these charges by Whitman. On the contrary, he says that according to their agreement, Whitman was to get his money when "we got ours," and then says: "I can assure you, that as soon as this money is paid, * * * you will receive settlement in full, etc."

The statement of Janes that Whitman would be paid when Janes got his money clearly supports the claim of Whitman that he was to pay when he had completed his job. The further statement that when he would get his money that Whitman would be "settled in full" imports a clear acknowledgment of the debt, including a promise for its payment when he would have collected his money, as agreed.

This letter from Whitman and the answer from Janes are plain and direct, need no construction, clarify the situation, strongly and almost unanswerably corroborate the testimony of Whitman that these switching charges had been originally stip-

ulated at $5 per car, and were to be paid when Janes would have completed the paving contemplated under his contract.

The contract for the payment of $565, being over $500, under article 2277, C. C., must be proved by at least one credible witness, and other corroborating circumstances.

There is nothing in the record to show that Whitman is not a credible witness. In fact, there is no intimation that he is not. Here, the answer of Janes virtually implies an acknowledgment of the debt with a promise to pay it, corroborative of Whitman's testimony in every essential element, and in reality more convincing than would be proof flowing from ordinary corroborative circumstances.

Plaintiff has therefore legally established his claim which must be enforced, unless it be defeated under the contention of defendant company that plaintiff, not being a common carrier, is without right or authority to make any charges for switching.

Plaintiff, as its name indicates, is engaged in exploiting sand and gravel, and is not engaged in the business of a common carrier for the transportation of freight for the general public. As it was in the instant case acting as a private carrier for the accommodation of defendant company, it was acting in the capacity of a private individual and, like all other private persons, had the right to make its own contract. 10 C. J. 38, sec. 4.

Counsel for defendant refer to authorities where it is held that a railway company is, relatively by transportation service of loaded freight cars, restricted to a fixed charge; also, to the regulations of the Louisiana Public Service Commission which requires railroad companies of this state to charge according to the rates established by the Commission, without discrimination for switching cars for any other railroad with which it connects, etc., for intrastate business. These rules of the Commission, and the authority cited by counsel which hold that the rates are restricted to a fixed charge, apply to railroad or transportation companies which are conducting a public employment for public purposes in that line of business. Corporations of that character are subject to the control of the state or federal governments which may provide for the regulation of rates subject to the constitutional guarantees. C. J. vol. 10, sec. 38.

In the instant case, the agreement was made by a private carrier, not engaged in the business of carrying as a public employment, for switching the cars to a designated point for the delivery of the goods in a particular case for a stipulated reward. The contract is not affected by the rates fixed for the regulation of railroads or other public agencies, and is legal, not being contrary to good morals, against public policy, or forbidden by law.

The judgment rejecting the demand is erroneous, and must be reversed, decreeing plaintiff entitled to a judgment for the amount claimed.

It is therefore ordered, adjudged, and decreed that the judgment be and is hereby avoided and reversed; that plaintiff have judgment against defendant in the sum of $1,245, with legal interest from judicial demand, with cost of court.

LECHE, J., not participating.